UNITED STATES of America, Appellee,

v.

Wayne Michael FONTAINE, Defendant, Appellant.

No. 77–1432.

United States Court of Appeals, First Circuit.

Argued March 7, 1978.

Decided May 9, 1978.

Robert D. Lewin, Malden, Mass., for appellant.

Charles E. Chase, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The only question presented by this appeal is whether the Government's failure to disclose the existence of certain tapes and a voice comparison test performed on them violated the defendant's right to a fair trial. Wayne Michael Fontaine was indicted on March 10, 1977, in a one count indictment for using the United States mail to convey a threat to injure the property and reputation of Iandoli Markets in violation of 18 U.S.C. § 876. A jury trial ended in a guilty verdict on April 21, but the district court, on June 13, ordered a new trial because the prosecutor had referred in his opening to prejudicial evidence that was later excluded. A superseding indictment was returned on July 7, charging Fontaine on three counts of the same offense and one count of violating 18 U.S.C. § 1716. The second trial began on July 18, and a verdict of guilty on Count 3, the same count as was in the first indictment, was returned on July 20. Fontaine was acquitted on the other three counts. On August 30 Fontaine filed a motion for a new trial, alleging that the Government had withheld material evidence, which the district court denied the same day. Fontaine appeals.

The one-count indictment at the first trial charged Fontaine with sending an extortionate letter through the mails on February 17, 1977. The letter in question demanded $10,000.00 from the Iandoli Markets, a Massachusetts supermarket chain, and warned that the writer "will carry out my threat" should his demands not be met. The letter was one of a series of incidents beginning in November, 1976, in which a person or persons unknown had threatened to use bombs against members of the Iandoli family and store premises if money were not paid. On November 30, 1976, a bomb was disclosed in an Iandoli store, and on January 26, 1977, a bomb delivered in the mail injured Mrs. Elizabeth Iandoli, the wife of one of the five brothers who owned Iandoli Markets.

The February 17 letter was mailed special delivery, and upon receipt was immediately traced back to the post office clerk who had taken it from the sender. The clerk gave a description of the sender, whom he had talked to and seen for approximately four minutes, and helped develop a composite picture of the suspect. A local newspaper carried a copy of the picture, and Fontaine came to the Worcester police station the next day to acknowledge his resemblance to the picture and protest his innocence. Fontaine permitted the police to take two pictures of him. On March 3, the postal clerk picked one of these pictures out of an array of 100 and then selected another picture of Fontaine, taken in his taxi cab driver's uniform, out of the Worcester files of licensed cab drivers. Later that day the clerk picked Fontaine out of a lineup, and Fontaine was arrested the next evening.

Before the first trial, the district court issued a standard discovery order that, in accordance with Fed.R.Crim.P. 16(a), *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the District of Massachusetts' Uniform Order for Automatic Discovery in Criminal Cases, noted the obligation of the Government to disclose, *inter alia*, "[a]ny reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons," and "any material or information which tends to negate the guilt of the accused or to reduce his punishment for the offense charged." Later that month, the Government and counsel for Fontaine exchanged letters indicating their agreement to comply with Rule 16 discovery procedures. On March 28, counsel for Fontaine filed a motion seeking copies of any tapes of alleged extortionate phone calls and any exemplars of Fontaine's voice which the Government possessed. That motion was heard before a magistrate on April 1, at which time the Government informed counsel for Fontaine that the Worcester police had in its possession two recordings, one made by employees of Iandoli Markets and the other by local police, of two extortionate phone calls made in December to the Markets, but that the Government did not have any copies. The postal inspector who had been handling the case indicated he had not used the tapes in preparing the prosecution and that no scientific comparisons had been made. The prosecutor suggested sending a postal inspector to the Worcester police to secure copies which could ultimately be turned over to defense counsel, but the magistrate felt it preferable simply to allow the motion, apparently feeling that this would support

any action Fontaine *might* initiate directly with state or local authorities to obtain the tapes. It is clear that it was not the magistrate's intention to force the Government to procure the tapes at this time. Thereafter, counsel for Fontaine neither sought the tapes from local authorities nor requested assistance from the Government in obtaining them.

At the April trial (the first trial) the prosecutor referred in his opening to several incidents besides the one that formed the subject of the indictment, including the discovery of a bomb in an Iandoli store on November 30, 1976, Fontaine's involvement in an attempt to extort an Iandoli employee on December 9 and the bomb injury of Elizabeth Iandoli on January 26. The district court later refused however, to admit evidence of these incidents or of any other threats to the Iandoli family personally, on the ground that the crime charged in the indictment involved a threat to property only. Following the guilty verdict, the district court granted Fontaine a new trial because of the likelihood of prejudice from the opening references. The Government responded by seeking a new indictment. One of the possibilities it then considered was adding a conspiracy count, as certain evidence indicated persons besides Fontaine were involved in the extortion plot.[1] Delving into the possibility, the Government finally obtained for itself a copy of the tapes of the two December calls held by the Worcester police, as well as a voice exemplar from Fontaine. These materials were sent off to a laboratory to be analyzed, the Government apparently hoping for a conclusive determination of whether someone other than Fontaine was the caller. On July 6, several weeks before Fontaine's

---

1. According to an offer of proof made at the first trial, one government witness, a security officer at Iandoli Markets, was prepared to testify that on December 9, 1976, an unidentified caller told an Iandoli employee to have someone wait at a particular corner in Worcester that evening. Sullivan went to the designated spot, and at the appointed time Fontaine pulled up in his cab and asked, "Are you the man from Iandoli's?" The police promptly came up to Fontaine and questioned him; Fontaine claimed to have been sent for the fare by his company's radio dispatcher. The radio dispatcher was prepared to testify that she did send Fontaine to meet Sullivan, as Fontaine was closest to the corner where Sullivan was waiting, but that she never told Fontaine the person he was to pick up was connected with Iandoli Markets. She also was prepared to testify that the unidentified caller who requested the cab be sent was not Fontaine, with whose voice she was familiar.

second trial, a laboratory official called the prosecutor with the following oral report:

"[D]ue to the acoustic quality of the recordings submitted for analysis, a sufficient number of consistent similarities or differences could not be found to render any decision one way or the other.

"The aural evaluation of the questioned and known speech samples indicates a slight difference in dialect which could mean that the two speakers are different persons."

A letter to the same effect was sent by the laboratory to the prosecution, but only after the close of Fontaine's trial. On July 7, the grand jury returned a four count indictment against Fontaine, charging him with sending the bomb to Elizabeth Iandoli, and sending extortionate letters to Iandoli Markets on February 1, 17, and 23, but omitting any reference to a conspiracy.

On the same day the indictment was returned, the Government sent counsel for Fontaine a letter acknowledging its discovery obligations under Rule 16. On July 15, the Friday before the Monday on which trial began, counsel for Fontaine filed several motions, including requests for disclosure whether any telephone conversations were recorded during investigation of the case, for copies of any tapes of recorded conversations in the Government's possession, for copies of any voice exemplars given by defendant, and for names and addresses "of each person the Government intends to call as a witness in the trial of the indictment which witness will testify concerning the identity of the voices on the tapes." The district court allowed the first and last requests; as to the remainder, it ordered the Government to notify the defendant before trial of the place where the tapes "if any" could be listened to and examined. Notwithstanding the court's ac-

tion, the Government did not communicate with defendant regarding the December tapes before or at trial. On the other hand, defense counsel neither raised the matter at trial nor otherwise pressed for the December tapes.[2]

The case against Fontaine at the second trial consisted principally of the identification of Fontaine by the postal clerk who received the registered letter of February 17. The Government also introduced evidence of the other two letters and the bomb mailed to Iandoli's home in January, but did not tie Fontaine directly to these acts. Fontaine took the stand in his own defense and denied any involvement in the plot. He contended that at 10:45 in the morning of February 17, when the postal clerk testified that the special delivery letter was mailed, he was talking to Dr. Clifford Browning at St. Vincent's Hospital in Worcester. Dr. Browning supported the alibi defense, testifying that to the best of his recollection he had talked to Fontaine until 10:30 or 11:00. Dr. Browning also stated that immediately after talking to Fontaine he went to the room of Dr. Lucille Pohley, a colleague at the hospital who was being prepared for surgery that day, Dr. Pohley then took the stand as a government rebuttal witness and testified that Dr. Browning came to her room between 9:00 and 9:30 in the morning to insert a catheter and remained until 10:00 or 10:30. The Government at no time alluded to the threatening calls made in December or to any other incidents before January, nor was there any allusion to the December tapes.

The defendant first learned on August 29, after the trial, of the voice comparison test respecting the December calls. At the hearing the next day on defendant's motion to set aside the verdict, counsel for defend-

---

**2.** The Government was informed of the court's action in the afternoon of the fifteenth. Trial counsel for the Government apparently was on vacation that week and did not learn of the court's order to permit inspection of the tapes until the eighteenth, the day the trial began. At the hearing on the motion for a new trial defense counsel argued that he did not press the matter concerning the tapes because he had

believed the tapes did not exist. His recollection of the April 1 hearing before the magistrate was that the Government had not confirmed the existence of any tapes but rather told him that if the tapes existed, he would be informed. The transcript of that hearing shows counsel's recollection to have been mistaken—the existence of the tapes had been fully revealed at the April 1 hearing.

ant incorrectly represented to the district court that he had not known of the existence of the tapes until he learned of the test. He described both the tapes and the test as material exculpatory evidence which the Government had willfully withheld.[3] The district court denied the motion, apparently on the ground that evidence indicating another person might have been involved in the plot would not have exculpated defendant.

Defendant attempts to bring this case within *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland, supra*, by arguing that the prosecution here withheld material exculpatory evidence that had been specifically requested by the defense. *See Agurs, supra* at 106, 96 S.Ct. 2392. A close examination of the record, however, reveals that these cases are inapposite. Fontaine's motion on the eve of the second trial asked the Government to disclose whether any telephone calls were recorded during investigation of the case and for copies of any such calls. It also sought the names of any witnesses to be called at trial to identify the tapes, indicating concern to avoid any possible surprise at trial should the Government offer a recording as part of its case-in-chief. While the December, 1976, tapes were not made in the course of the federal investigation and were no part of the Government's case, we think that the motion was broad enough to be construed as a request for the December tapes. Upon its allowance, the prosecution should have proffered these tapes to the defense. On the other hand, the prosecutor had disclosed the existence of the tapes to the defense three months earlier without attracting any further interest and the tapes formed no part of the Government's own case, nor were they of obvious value to the defense.[4] The Govern-

ment was at least not in default of so much of the pretrial order as required disclosure, although it was in default of the production order.

In these circumstances we do not think the Government's failure to produce the tapes at the second trial constituted a violation of *Brady* or *Agurs* entitling Fontaine to a new trial. Whatever the Government's failings to produce the evidence in light of Rule 16 and the district court's orders, the facts of this case indicate that the Government met its obligation to disclose exculpatory evidence in satisfaction of Fontaine's due process rights. The defense knew everything it needed to know to obtain the tapes; its only burden was to act on this knowledge.

Furthermore, it is hard to see how the tapes would have affected its case. *Compare United States v. Padrone*, 406 F.2d 560 (2d Cir. 1969). Had they been played to the jury in hopes of proving the December, 1976, caller was not Fontaine, the Government then would surely have been able to introduce its own evidence indicating that during December, 1976, Fontaine had been involved with another person in the extortion plot. *See* note 1 *supra*. The evidence against Fontaine as to the one count on which he was convicted was substantial. Given Fontaine's foreknowledge of the tapes in issue and his manifest lack of diligence and interest in them, we do not think that the Government's failure to volunteer the tapes to Fontaine rises to the level of reversible error.

The voice comparison test presents a closer question. While defense counsel knew that Fontaine had furnished exemplars, he did not know that the Government had made a test. Although the defendant did not make a request for such tests before either trial, test results are covered in spe-

---

**3.** Defense counsel's motion did not, itself, refer to the voice comparison test, but instead claimed that the withholding of the tapes themselves was reversible error. At the hearing on the motion, however, counsel made clear his objection was to the Government's failure to disclose both the tapes and the test.

**4.** As the transcript shows, the magistrate mentioned at the April 1 hearing the possible value to Fontaine of a voice comparison, in order to show that he was not the person who made the extortionate requests. Fontaine's failure to follow up on this obvious line of inquiry can only be assumed to reflect a calculated choice of strategy.

cific terms by Rule 16(a)(1)(D). A Uniform Order for Automatic Discovery in Criminal Cases, which was in effect in the District of Massachusetts during these proceedings, required production of Rule 16(a)(1)(D) materials, and we may assume, as the Government does not argue to the contrary, that "the Order was tantamount to a defense request in triggering Rule 16 discovery duties." *United States v. Gladney*, 563 F.2d 491, 493 (1st Cir. 1977). We therefore conclude that the equivalent of a "specific request" under *Agurs*, 427 U.S. at 106, 96 S.Ct. 2392, took place here.

Application of *Agurs* to the test results does not help defendant, however, as on balance it would appear that the voice test results were not material evidence, and, therefore, would not have been likely to affect the outcome of the trial. The results of the voice comparison were reported to be inconclusive. The opinion of the expert, as reported orally to the Government as of the time of trial, was that the quality of the recordings was too poor to render any decision one way or the other. This amounted to an opinion that the tapes, for comparative purposes, were worthless. The expert did, it is true, speak of noting in the aural evaluation a slight dialect difference, which could mean the speakers were different. Even if the defense, by examining the expert, could have elicited more conclusive testimony, perhaps on the basis of an aural comparison of the tapes with defendant's own voice, its position would have been little different than if it had obtained the tapes directly, which it could have done at any time after April 1, and undertook to make its own comparison. That Fontaine did not pursue this course indicates a tactical decision against it, the reasons for which seem easily perceived. The best the defense could have done (and, given the inconclusive nature of the report, even this is highly speculative) was to show that someone besides Fontaine may have made extortionate phone calls to Iandoli Markets in December, 1976. But as the defense well knew, the Government had its own evidence tending to show that Fontaine was working with someone else in December; a voice comparison based on calls within the same time frame would have paved the way for introduction of this inculpatory testimony. Although the failure of the Government to inform the defense that the inconclusive test had been run reflects poorly on government counsel, we are unable to conclude that the evidence was material, or that its denial in any conceivable way prejudiced Fontaine, given his knowledge of the tapes. *See also Norris v. Slayton*, 540 F.2d 1241, 1243–44 (4th Cir. 1976). As a result, we affirm the denial of the motion for a new trial.

*Affirmed.*